**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**TEAM TIRES PLUS, LTD., a Minnesota Corporation**,

Plaintiff,

v.

**MARK HEARTLEIN, and KARRIE HEARTLEIN**,

Defendants.

**KARMARK, INC., and MARK HEARTLEIN**,

Counter-claimants,

v.

**TEAM TIRES PLUS, LTD.**,

Counter-defendant.

Civil No. 01-1197 (JGL)

**O R D E R**

---

APPEARANCES

Tim Staum and Peter Silverman, Esqs., for Plaintiff and Counter-defendant Team Tires Plus, Ltd.

D. Clay Taylor, Esq., for Defendants Mark and Karrie Heartlein, and Counter-claimants Mark Heartlein and Karmark, Inc.

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

The above-entitled matter came on for hearing before the undersigned on March 11, 2004, on Counter-claimants' Motion to Amend Counterclaim to Join Claim for Punitive Damages (Doc. No. 53). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties voluntarily waived their rights to proceed before a judge of the United States District Court and consented to have the undersigned Chief Magistrate Judge of the United States District Court conduct all proceedings in the case, including entry of a final judgment.

On March 10, 2004, the Court received Counter-claimants' Memorandum in Reply, with various attached exhibits. At the outset of oral argument in this matter, the Court informed the parties that Local Rule 7.1(a) does not provide for moving-party reply briefs in non-dispositive motions. Further, even if Counter-claimants had leave of the Court, the total pages exceed the limit in Local Rule 7.1(c), and the Reply was filed untimely under Rule 7.1(b). On March 16, after a draft of this Order had been completed, the Court received by facsimile a letter from counsel for Defendants and Counter-claimants. Counsel represents that prior to the hearing, the parties had stipulated to the filing and timing of reply materials. While the Court

appreciates the cooperation of counsel, it is obligated to note that it would have been more time efficient to notify the Court of the stipulation at the hearing rather than one week later. Nonetheless, the Court grants counsels' request and has reviewed the reply materials submitted in this Motion. The parties must yet obtain the Court's leave for all future deviations from the Local Rules.

## I. INTRODUCTION

Plaintiff Team Tires Plus, Ltd. ("Tires Plus"), is a franchisor of stores that sell tires and automotive services such as brakes, wheel balancing alignments, oil changes, etc. In 1997, Tires Plus sold a franchise in Galesburg, Illinois, to Defendant Mark Heartlein ("Heartlein"). In 1999, Tires Plus sold a franchise in nearby Burlington, Iowa, to Heartlein and Karmark, Inc. ("Karmark").[1] The parties disagree as to the exact dates when Heartlein and Karmark became bound to the franchise agreements.

Tires Plus brought this action in July 2001, alleging that Defendant Heartlein and his wife Defendant Karrie Heartlein are in financial default and have breached the Galesburg and Burlington franchise agreements. Heartlein counterclaimed and joined Karmark as a Counter-

[1] Defendant Karmark was apparently owned by Heartlein during times relevant to this case. (See Ptf's Mem. Opp'n Mot. Amend at 2.)

claimant, alleging common law fraud and various violations of the Illinois Franchise Disclosure Act of 1987, 815 Ill. Comp. Stat. 705/1-44 (2004) ("Franchise Act"). On March 9, 2004, the parties stipulated to dismissal of certain counts brought by each. The parties further agreed that the Franchise Act does govern and is applicable to Amended Counterclaim Count VI (Violation of Illinois Franchise Act), and that Minnesota law governs all other counts and claims in the pleadings.

Counter-claimants Heartlein and Karmark now propose to amend their Counterclaim Counts 1 (Fraud) and Count VI (Violation of Illinois Franchise Act) to include claims for punitive damages pursuant to Minn. Stat. §§ 549.191 and 549.20. Heartlein and Karmark submit that punitive damages be handled in three phases: (1) at the close of evidence, the jury would be instructed on the parties' principal claims, compensatory damages, and ordinary burden of proof; (2) should the jury find in Counter-claimants' favor on their common law fraud or Franchise Act claims, the jury would be instructed on the liability elements of punitive damages and retire for deliberations on the question of whether Counter-claimants have proved punitive damages are appropriate, under the applicable legal standards; finally, (3) should the jury find that punitive damages may be awarded,

Heartlein and Karmark would present evidence and arguments concerning the amount of punitive damages, and the jury would retire to render a final verdict on the amount of punitive damages. Team Tires opposes Counter-claimants' Motion, asserting that they have failed to establish a prima facie claim for punitive damages as required by Minnesota statute.[2]

## II. STANDARD OF REVIEW AND FACTUAL BACKGROUND

Counter-claimants are required by Minn. Stat. § 549.20, subd. 1(a), to produce "clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." To be clear and convincing, the proof must be more than a preponderance but less than beyond a reasonable doubt. See Weber v. Anderson, 269 N.W.2d 892, 895 (Minn. 1978). The Court must review the evidence submitted by Heartlein and Karmark in support of the state law claims as the Court would review a motion for a directed verdict or for entry of judgment as a matter of law under Federal Rule of Civil Procedure 50(a). See Ulrich, 848 F. Supp. at 867. Thus, the Court makes no credibility rulings and does not consider any challenge to

[2] As the parties have not raised the issue, this Court does not express an opinion on the propriety of following the Minnesota statutory procedures for filing punitive damage claims, rather than following the Federal Rules of Civil Procedure. See, e.g., Josh Jacobson, Pleading Punitive Damages: An Erie Dilemma, Bench & B. of Minn. (Feb. 2001).

the movants' proof. Id. Likewise, a court should examine the evidence submitted by the moving party without considering evidence presented by the opposing party. See Northwest Airlines, Inc. v. American Airlines, Inc., 870 F. Supp. 1499, 1502-03 (D. Minn. 1994) (citation omitted). Also, a court must examine the evidence in the context of the asserted claims. See Olson v. Snap Prod., Inc. 29 F. Supp. 2d 1027, 1037 (D. Minn. 1998). The following facts are found in evidence presented by Counterclaimants.

Before taking on the franchises, Heartlein worked as a stock broker, financial planner, and general manager of a multi-million dollar company whose business doubled in less than two years under his leadership. Heartlein had no prior work or business experience specifically in the tire or automotive retail businesses.

Pursuant to purchase of the Galesburg franchise, on April 17, 1997, Tires Plus provided Heartlein with Uniform Franchise Offering Circulars ("UFOC") for Minnesota and Illinois for his review. On May 5, 1997, Heartlein completed Tires Plus' Preliminary Information form, in which he outlined his experience and provided detailed personal financial information. He also completed an Application for Franchise Agreement. The application contained an informational outline of the application and approval process, broken down

into four parts: "STAGE I: Personal Interview . . . STAGE II: Review of applicant's personal and financial background. STAGE III: Review of applicant's proposed site. STAGE IV: Successful completion of Tires Plus Group's Training Program at Tires Plus University." (Defs' Ex. 6 at T0341.) The application also states: "Your Franchise Agreement will be issued after the Franchise Review Committee has approved your application through Stage III . . . DO NOT MOVE OR INCUR ANY EXPENSES RELATIVE TO THIS APPLICATION UNTIL YOU HAVE RECEIVED WRITTEN NOTIFICATION OF SUCCESSFUL COMPLETION OF STAGE III OF THIS PROCESS." (Id. (emphasis in original).)

On May 12, 1997, Heartlein completed his personal interview before the Franchise Approval Committee and was granted Stage I and II approval to purchase a Tires Plus Auto Service Center in Galesburg. (Hyduke Dep. 50-52.) On May 30, 1997, Tires Plus sent Heartlein a franchise agreement, which he signed and returned on June 12, 1997, with his initial payment of $15,000. (Id. at 50-54.) Counter-claimants assert that the timing of the franchise agreement was outside the guidelines established by Tires Plus, as Heartlein had not progressed through Stage III. Tires Plus Vice President for Franchise Development John Hyduke was deposed by

Counterclaimants and admitted that although Heartlein had signed the franchise agreement, he remained entitled to cancel his application without cause and obtain a refund of all but $3,500 of his franchise fee until such time as he signed a lease or entered into any purchase agreement to buy land. (Id. at 53-54.) Hyduke stated that this escape clause is contained in the UFOC.[3] (Id. at 53.) Counter-claimants construe Hyduke's deposition testimony to mean that until a franchisee obtains Stage III approval, he retains the right to cancel. (Countercls' Mem. Supp. Mot. Amend at 11.) Nonetheless, certain confidentiality and non-competition clauses of the franchise agreement would survive termination and continue to bind Heartlein. (Hyduke Dep. 53.)

On August 26, 1997, Tires Plus provided Heartlein with a detailed three-year pro forma with costs, sales, and earnings information for the Galesburg Market. (Defs' Ex. 7.) The pro forma does not contain any disclaimers or admonitions. Along with the pro forma, Tires Plus provided

---

[3] The UFOC states in pertinent part, "You have the right to cancel your Franchise Agreement for any reason before signing documents that legally obligate you to develop the property for the Franchised Service Center. If you exercise this right to cancel, Tires Plus will retain $3,500 for its administrative and out-of-pocket expenses, and will refund the balance of the Initial Fee to you." (Defs' Ex. marked Ill. UFOC at 1.)

Heartlein with a detailed demographic breakdown of the Galesburg market area that included a summary page with the following heading:

CUSTOM SUMMARY REPORT
(MEDIUM MARKET DEMOGRAPHIC ANALYSIS)
BY EQUIFAX NATIONAL DECISION SYSTEMS 800-866-6511.

(Defs' Ex. 24.) Equifax National Decision Systems ("Equifax") is an objective, third party source of demographic information. However, Tires Plus also included near the bottom of the page, a "multiplier factor" that increased projected sales volume by twenty-five percent for the Galesburg franchise above that presented by Equifax. Thus, the final numbers at the bottom of the report are not the "Equifax Store Potential" (located above), but rather a "Total Store Potential" figured by Tires Plus as twenty-five percent higher earnings. (Id.) This "multiplier factor" is not labeled as being supplied by Tires Plus and is in the same typeface as the rest of the document. (Id.) The multiplier was inserted by Tires Plus into the Equifax documents for each franchise in this case to bring projected sales results for potential new stores into line with the actual results of existing Tires Plus stores. (Hyduke Dep. at 71-77.)

Heartlein signed a lease for the Galesburg franchise location on August 26, 1997, the same day he received the Galesburg pro forma. (Defs' Ex 7; M. Heartlein Dep. at 107.) On September 12, 1997, Tires Plus informed

Heartlein that the Galesburg franchise was approved through Stage III. (Defs' Ex. 24 at T304; Defs' Ex. 28.) On September 16, Heartlein paid Tires Plus the remaining $12,000 owed on the franchise fee. Counter-claimants assert that Heartlein was locked into the agreement only at this point. The Galesburg franchise began operating in October 1997, and by early 1998, it was operating at a loss.

Meanwhile, Heartlein and Tires Plus proceeded with the sale of another franchise located in nearby Burlington, Iowa. Heartlein asserts that he was assured by Tires Plus management that the opening of another store would help improve visibility and cash-flow at the Galesburg store. (M. Heartlein Dep. at 190-91.) On April 13, 1998, Heartlein and Karmark applied for the Burlington franchise. (Hyduke Dep. at 93.) Stage II approval followed on May 7, and on June 4, Heartlein and Karmark signed a franchise agreement, once again prior to Stage III approval and prior to finding a franchise site. (Id. at 94-96.) In July, Heartlein paid the initial fee of $8750. (Id. at 99.) At the same time, Heartlein also purchased from Tires Plus an option on a third franchise location in Decatur, Illinois, which he never exercised. (Id.) Tires Plus signed the Burlington franchise agreement on August 11, 1998. (Id. at 98.) In December 1998, Tires Plus proposed certain

modifications to the payment of accounts receivable from Heartlein to help him through the period of "difficult cash flow" at his poorly performing Galesburg franchise. (Defs' Ex. 34.)

Counterclaimants did not provide the Court with evidence regarding the date the Burlington lease was signed. On January 25 and on April 27, 1999, Tires Plus provided pro formas for the Burlington franchise that were identical in form and format to the Galesburg pro forma, including Equifax reports with Tires Plus multiplier factors. (Defs' Exs. 8,9; Hyduke Dep. at 106-09.) The multiplier factor increased projected sales volume by forty-seven percent for the Burlington franchise above that presented by Equifax. (Defs' Ex. 49.) In mid-May, 1999, the Burlington franchise went through Stage III approval. (Hyduke Dep. at 101-02; Defs' Ex. 30.) Counter-claimants represent that they made their final franchise fee payment on the Burlington franchise on May 25, 1999.

Throughout 1999 and 2000, both franchises operated at a significant loss and Heartlein was delinquent on the payment of both franchise and advertising fees, and on his account for the purchase of tires and goods from Tires Plus. (Countercls' Mem. Supp. Mot. Amend at 13-14.) Finally, in December 2000, Tires Plus notified Heartlein of its intent to

terminate his franchises, which it formally did in April 2001. (Defs' Exs. 36, 40.)

## III. DISCUSSION

In the District of Minnesota, the present practice is to require a party to follow Minn. Stat. §§ 549.191 and 549.20 to plead punitive damages for claims brought pursuant to Minnesota state law. See Hern v. Bankers Life Cas. Co., 133 F. Supp. 2d 1130, 1134-35 (D. Minn. 2001); Ulrich v. City of Crosby, 848 F. Supp. 861, 866 (D. Minn. 1994) (citations omitted). A party seeking to assert a punitive damage claim or counterclaim may not include it in the initial pleadings, but must move for leave to amend based on a prima facie showing of entitlement. See Ulrich, 848 F. Supp. at 867; Minn. Stat. § 549.191. At this point in the litigation, Counterclaimants are not required to demonstrate an entitlement to punitive damages per se, only an entitlement to allege such damages. See Ulrich, 848 F. Supp. at 867 (citation omitted).

Prima facie evidence is evidence which, if unrebutted, would sustain a judgment in the moving party's favor. See Swanlund v. Shimano Indus. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. App. 1990) (citing Black's Law Dictionary 1071 (5th ed. 1979)). The term "prima facie" does not describe a quantum of evidence, but a standard for designating meritorious claims. See

id. The quantum of evidence needed to plead punitive damages is prescribed by Minn. Stat. § 549.20, subd. 1(a), which requires "clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others."

Not only must a party put forth evidence, but it is axiomatic that it must also show that punitive damages are allowed under the substantive law of the claims asserted. An examination of the evidentiary submissions without first determining whether the relevant law even permits punitive damages would be a futile exercise. Thus, the Court first turns to the question of whether punitive damages are allowed for the asserted counterclaims.

### A. Whether Defendants May Counterclaim for Punitive Damages Under the State Law Claims Asserted

Counter-claimants' First Amended Counterclaim includes two state law claims under which they attempt to plead punitive damages: Minnesota common law fraud, and violation of the Illinois Franchise Act.

Minnesota courts have allowed punitive damages in some cases of common law fraud. E.g., Hydra-Mac, Inc. v. Onan Corp., 430 N.W.2d 846, 852, 856 (Minn. Ct. App. 1988), rev'd in part on other grounds, Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913 (Minn. 1990); Sullivan v. Ouimet, 377 N.W.2d 24, 27 (Minn. Ct. App. 1985). Also, courts in Illinois have awarded punitive

damages for violation of the Franchise Act. E.g., Cox. v. Doctor's Assocs., Inc., 613 N.E.2d 1306, 1326-28 (Ill. App. Ct. 1993). Hence, punitive damages are allowable under the theories proposed by Counter-claimants.

**B. Whether Defendants Have Met the Statutory Threshold for Pleading Punitive Damages**

Counter-claimants must produce "clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." See Minn. Stat. § 549.20, subd. 1(a). To be clear and convincing, the proof must be more than a preponderance but less than beyond a reasonable doubt. See Weber v. Anderson, 269 N.W.2d 892, 895 (Minn. 1978). As discussed above, the Court must review the evidence submitted by Heartlein and Karmark as the Court would review a motion for entry of judgment as a matter of law, not considering any challenge to Counterclaimants' proof. See Ulrich, 848 F. Supp. at 867; Fed. R. Civ. Pro. 50(a). If there is no legally sufficient evidentiary basis for a reasonable jury to find for Counter-claimants on the issue of punitive damages, the Court must deny the Motion to Amend. See Fed. R. Civ. P. 50(a).

**1. Minnesota Common Law Fraud**

Minnesota courts have defined fraud as any kind of artifice used by one person to deceive another. Roebuck v. Wick, 107 N.W. 1054, 1054

(Minn. 1906). The elements of fraud under Minnesota law are: (1) "a false representation pertaining to a material past or present fact susceptible of human knowledge;" (2) knowledge by the one making the representation of its falsity, or assertion of it without knowledge of its truth or falsity; (3) "an intention that the other person act on it, or circumstances justifying the other person in so acting;" (4) the other person in fact reasonably relied on the representation; and (5) damage attributable to the misrepresentation. In re Strid, 487 N.W.2d 891, 893-94 (Minn. 1992) (citation omitted); In re Anderson, 565 N.W.2d 461, 465 (Minn. Ct. App. 1997). Fraud must be proven by a preponderance of the evidence. State by Humphrey v. Alpine Air Prods., Inc., 500 N.W.2d 788, 791 (Minn. 1993).

The issue of fraud must be viewed against the backdrop of the parties' relationship. E.g., Hollerman v. F.H. Peavy & Co., 130 N.W.2d 534, 540 (Minn. 1964). Further, a party who is inexperienced in matters concerning the representations made may have a right to rely upon the superior knowledge of another, particularly in the context of a knowing and intentional fraud. Fischer v. Division of W. Chincilla Ranch, 310 F. Supp 424, 429 (D. Minn. 1970) (applying Minnesota law). As a result, fraud renders

voidable everything into which it enters. E.g., Magee v. Odden, 20 N.W.2d 87, 89 (Minn. 1945).

Counter-claimants assert that Tires Plus knowingly used false sales projections to entice them to purchase the franchises, such that they have established a prima facie case of common law fraud. Specifically at issue are the documents provided by Tires Plus for each franchise that included Equifax Custom Summary Reports, described in section II, supra. Counter-claimants assert that they believed each report originated wholly from Equifax, not in part from Tires Plus, and that they were lead to believe such by the format of the reports. Plaintiff insists that Counter-claimants cannot show that they relied upon the pro formas, and cannot make out a prima facie case of fraud upon which to rest punitive damages.

The Court finds that Counter-claimants have met their burden at this point in the litigation, as their evidence, if unrebutted, would sustain a judgment in their favor. See Swanlund, 459 N.W.2d at 154. Counter-claimants have established the first element of fraud through the Equifax reports altered by Tires Plus without notification to the franchisee. Tires Plus presented the franchisees with documents that appear to be from a third-party, objective source, when in fact they contain key numbers supplied by

the franchisor. Nothing in the reports indicate that any information is derived from any source other than Equifax. These documents create a prima facie showing of false representations pertaining to material present facts susceptible of human knowledge.[4] See In re Strid, 487 N.W.2d at 893-94. The parties note that allegations of fraud must relate to a past or existing fact rather than future contingencies or predictions. Schoenhals v. Mains, 504 N.W.2d 233, 236 (Minn. Ct. App. 1993.) While the pro formas present potential sales figures, the representation that the figures originated from an objective third party constitutes an existing, actionable fact. Likewise, the evidence establishes the second element of fraud as Tires Plus knew that the documents were not generated wholly from Equifax, and thus, knew the representations were false. See In re Strid, 487 N.W.2d at 893-94. Third, reviewing only the movants' evidence, the Court finds that the circumstances justified Counter-claimants in believing the falsity. See id.

Fourth, based on Counter-claimants' evidence, Heartlein and Karmark still had the right to rescind without cause until Stage III approval of

---

[4] Counter-claimants also present evidence showing that Tires Plus had figured different "break even" numbers for Counter-claimants' franchises than the numbers revealed in the pro formas. As the Court finds the matter of the demographic reports dispositive of Counter-claimants' right to allege punitive damages for fraud, it need not discuss this related issue in this Order.

their site leases. Although Mr. Hyduke's deposition testimony was that a franchisee retained the right to cancel until he signed a lease, the UFOC provides for the right to cancel "before signing documents that legally obligate [franchisee] to develop the property for the Franchised Service Center." (Defs' Ex. marked Ill. UFOC at 1 (emphasis added).) According to the time line presented in Counter-claimants' evidence, they received the Equifax reports with the Tires Plus multiplier factors before Stage III approval of either franchise. Further, Heartlein testified in his deposition that he took the pro formas to be "an accurate representation of what our sales would be for the first three years . . . based on a professional, outside source, Equifax, coming in and doing all these demographics and that they had researched the community . . . ." (M. Heartlein Dep. at 98.) Thus, the Court may determine on the unchallenged evidence that Counter-claimants in fact reasonably relied on the altered Equifax reports in choosing to forego their right to cancel until Tires Plus had formally approved of the lease space. See In re Strid, 487 N.W.2d at 893-94. Lastly, the fifth element of a prima facie case of fraud is met in that Heartlein and Karmark have shown damage attributable to the misrepresentations. See id.; (Defs' Ex. 12: Expert Damages Report.)

The quantum of evidence needed to plead punitive damages is "clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20, subd. 1(a). Again making no credibility rulings and not considering any challenge to the movants' proof, the Court finds that Counter-claimants have established a prima facie case for punitive damages. In presenting inflated sales projections in the pro formas, a reasonable person could conclude that Tires Plus deliberately disregarded the rights of its franchisees. See Ulrich, 848 F. Supp at 867. Hence, the Court finds that Counter-claimants have established their right to allege punitive damages at trial in relation to Counterclaim Count I.

### 2. Illinois Franchise Act Claims

The Franchise Act defines "fraudulent practices" as follows:

> Fraudulent Practices. In connection with the offer or sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

815 Ill. Comp. Stat. 705/6. The Act also mandates that all UFOCs be free from any false or misleading statement of material fact. 815 Ill. Comp. Stat.

705/16. The Franchise Act further provides regulations governing the use of earnings statements for prospective franchisees. In pertinent part, the regulations require that an earnings claim made in connection with an offer of a franchise shall be included in full in the UFOC, have a reasonable basis at the time it is made, and shall include a description of its factual basis and the material assumptions underlying its preparation and presentation. 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 19. The regulations also require earnings claims to carry "[a] conspicuous admonition that the new franchisee's individual financial results are likely to differ from the result stated in the earnings claim." Id. at item 19(B)(ii)(c). Counter-claimants also point out that the regulations hold that the "burden is upon the franchisor to show that it has a reasonable basis for its earnings claim." Id. at item 19A(v).

Similarly, this Court finds that Counter-claimants have made out a prima facie case for fraudulent practices under the Franchise Act. Just as Counter-claimants demonstrated prima facie reliance on the pro formas prior to Stage III approval under their common law fraud claim, the Court finds that Counter-claimants have shown they may be considered prospective franchisees at the time they received the pro formas. The unrebutted evidence shows that Tires Plus employed a scheme to defraud by omitting

statements of material fact, necessary to make the statements not misleading under the circumstances, by omitting information from the pro formas that would have revealed that the report labeled as originating from Equifax also contained numbers inserted by Tires Plus. See 815 Ill. Comp. Stat. 705/6. Counter-claimants' evidence also shows that this practice or course of business by Tires Plus operated as a fraud or deceit. See id.

Additionally, the Court finds that the pro formas would qualify as earnings statements under the regulations, such that they should have included a description of the factual basis and material assumptions underlying the reports' preparation and presentation. See 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 19(A)(i), (B)(i)-(ii). Similarly, the pro formas failed to carry "[a] conspicuous admonition that the new franchisee's individual financial results are likely to differ from the result stated in the earnings claim." See id. at item 19(B)(ii)(c). Hence, the Court is satisfied that Counter-claimants' evidence demonstrates prima facie violations of the Franchise Act.

Not considering any opposition to Counterclaimants' proof, the Court finds that they have established a prima facie case for punitive damages under the Franchise Act. See Minn. Stat. § 549.20, subd. 1(a). Similar to the

Minnesota common law fraud claims, a reasonable person could conclude that Tires Plus deliberately disregarded the rights of its franchisees by presenting increased sales projections in the pro formas without labeling the source or describing the underlying factual basis and material assumptions of the reports. See Ulrich, 848 F. Supp at 867. Counter-claimants have demonstrated their right to allege punitive damages at trial in relation to Counterclaim Count VI (Violation of Illinois Franchise Act).

**3. Claims Involving Third Party Vendor Rebates**

As a smaller matter, Counter-claimants allege that unbeknownst to them, Tires Plus had agreements with certain third party vendors, whereby these companies charged franchise stores an inflated price for goods purchased directly from them, and that the vendors would rebate between five and ten percent of the franchisee's purchases to Tires Plus. Counter-claimants assert that Tires Plus had a duty to disclose this arrangement in its UFOC. However and importantly, Heartlein admits that he was free to purchase goods from any third party vender of his choice. Heartlein and Karmark assert this scheme constitutes fraud by omission and violates Franchise Act regulations that require a franchisor to disclose recurring fees or payments that the franchisee must pay to the franchisor or its affiliates, or

that the franchisor or its affiliates impose or collect in whole or in part on behalf of a third party. 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 6.

In this regard, Counter-claimants have failed to make out a prima facie case. They have presented evidence neither of fees that Counter-claimants must pay to Tires Plus or an affiliate, nor of fees that Tires Plus or an affiliate collected on behalf of a third party. See id. Thus, regardless of the amount of rebates some venders were returning to Tires Plus, Counter-claimants have not presented facts sufficient to show a violation of Franchise Act regulations. Likewise, the facts do not show fraud by omission, as the Court finds no evidence of false representation by Tires Plus in its UFOC, as claimed by Counter-claimants. (See Defs' Ex. marked Ill. UFOC at 6-9, 13-15.) Also, Counter-claimants offer no evidence of detrimental reliance or damage in that there is no indication whether the vendor payments resulted in any price differential to franchisees. See In re Strid, 487 N.W.2d at 893-94.

In sum, viewing Counter-claimants' evidence without rebuttal, the Court concludes that they should be permitted to go forward in their attempt to obtain punitive damages on claims of fraud and violation of the Franchise

Act, other than claims arising from the rebating scheme. Whether Counter-claimants will be able to make out the claims at trial is yet to be seen.

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Amend Counterclaim to Join Claim for Punitive Damages (Doc. No. 53) is **GRANTED IN PART** and **DENIED IN PART** as explained fully in the body of this Order. In accordance with the dictates of this Order, Counter-claimants are directed to amend their Counterclaim Counts 1 (Fraud) and Count VI (Violation of Illinois Franchise Act) to include claims for punitive damages pursuant to Minn. Stat. §§ 549.191 and 549.20 within two weeks of the date of this Order.

Dated: March 17, 2004

s/ Jonathan Lebedoff
JONATHAN LEBEDOFF
Chief United States Magistrate Judge