**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**TEAM TIRES PLUS, LTD., a Minnesota Corporation**,

Plaintiff,

v.

**MARK HEARTLEIN, and KARRIE HEARTLEIN**,

Defendants.

**KARMARK, INC., and MARK HEARTLEIN**,

Counterclaimants,

v.

**TEAM TIRES PLUS, LTD.**,

Counterdefendant.

Civil No. 01-1197 (JGL)

**O R D E R**

APPEARANCES

Tim Staum and Peter Silverman, Esqs., for Plaintiff and Counterdefendant Team Tires Plus, Ltd.

D. Clay Taylor, Esq., for Defendants Mark Heartlein and Karrie Heartlein, and Counterclaimants Mark Heartlein and Karmark, Inc.

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

The above-entitled matter came on for hearing before the undersigned on April 13, 2004, on Plaintiff's Motion for Summary Judgment as to Defendants' Counterclaims (Doc. No. 65). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties voluntarily waived their rights to proceed before a judge of the United States District Court and consented to have the undersigned Chief Magistrate Judge of the United States District Court conduct all proceedings in the case, including entry of a final judgment.

## I. INTRODUCTION

Plaintiff Team Tires Plus, Ltd. ("Tires Plus"), is a franchisor of stores that sell tires and automotive services such as brakes, wheel balancing alignments, oil changes, etc. In 1997, Tires Plus sold a franchise in Galesburg, Illinois, to Defendant Mark Heartlein ("Heartlein"). In 1999, Tires Plus sold a franchise in nearby Burlington, Iowa, to Heartlein and Karmark, Inc. ("Karmark").[1] The parties disagree as to when Heartlein and Karmark became legally bound to the franchise agreements.

[1] Defendant Karmark was owned by Heartlein and his wife Defendant Karrie Heartlein during times relevant to this case. (M. Heartlein Dep. at 121.)

Tires Plus brought this action in July 2001, alleging that Defendant Heartlein and his wife Defendant Karrie Heartlein are in financial default and have breached the Galesburg and Burlington franchise agreements. On October 26, 2001, Heartlein counterclaimed and joined Karmark as a Counterclaimant, alleging common law fraud and various violations of the Illinois Franchise Disclosure Act of 1987, 815 Ill. Comp. Stat. § 705/1-44 (2004) ("Franchise Act"). On March 9, 2004, the parties stipulated to dismissal of certain counts brought by each. The parties further agreed that the Franchise Act does govern and is applicable to First Amended Counterclaim Count VI (Violation of Illinois Franchise Act), and that Minnesota law governs all other counts and claims in the pleadings. (Stip. & Order of Mar. 9, 2004.)

On March 17, 2004, this Court granted in part and denied in part Defendant's Motion to Amend Counterclaim to Join Claim for Punitive Damages. In accordance with that Order, Counterclaimants amended their Counterclaim to include certain claims for punitive damages pursuant to Minn. Stat. §§ 549.191 and 549.20.[2]

---

[2] In making its punitive damages determination, the Court reviewed the evidence submitted by Heartlein and Karmark in support of their Minnesota state law claims as the Court would review a motion for a directed verdict or for entry of judgment as a matter of law under Federal Rule of Civil Procedure

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed fact is "material" if it must ultimately be resolved and if its resolution will determine the outcome of the case. Id. Materiality is determined by examining the substantive law of the claims. Id. For the purpose of summary judgment, the Court views the facts in the light most favorable to the non-moving party, in this case, Counterclaimants Heartlein and Karmark. See Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997) (citations omitted).

The non-moving party may not rest upon the pleadings alone as a response but "must set forth specific facts showing that there is a genuine

---

50(a). See Ulrich v. City of Crosby, 848 F. Supp. 861, 867 (D. Minn. 1994). Thus, the Court made no credibility rulings, did not consider any challenge to Counterclaimants' proof, and examined Counterclaimants' evidence without considering evidence presented by Plaintiffs. See Northwest Airlines, Inc. v. American Airlines, Inc., 870 F. Supp. 1499, 1502-03 (D. Minn. 1994) (citation omitted).

issue for trial." Fed. R. Civ. P. 56(e). The non-moving party may not rely on mere allegations or denials but must present specific facts. Id.; Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999) (citations omitted). Additionally, the moving party is entitled to summary judgment when the non-moving party fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

## III. FACTUAL BACKGROUND

As noted above, the Court must view the facts in the light most favorable to Heartlein and Karmark. See Lower Brule Sioux Tribe, 104 F.3d at 1021. Before taking on the Tires Plus franchises, Heartlein had worked as a stockbroker, financial planner, and general manager of a multi-million dollar company whose business doubled in less than two years under his leadership. (M. Heartlein Dep. at 8-17.) Heartlein represents that he had no prior work or business experience specifically in the tire or automotive retail businesses. (See M. Heartlein Dep. at 8-19.)

Pursuant to purchase of the Galesburg franchise, on March 11 and again on April 17, 1997, Tires Plus provided Heartlein with Uniform Franchise Offering Circulars ("UFOC") for Minnesota and Illinois for his review. (Hyduke Dep. at 92-93; Ex. 24 at T0366-69.) On May 5, 1997, Heartlein completed Tires Plus' Preliminary Information form, in which he outlined his experience and provided detailed personal financial information. (Hyduke Dep. at 47; Ex. 24 at T0335-39.) He also completed an Application for Franchise Agreement. The application contained an informational outline of the application and approval process, broken down into four parts: "STAGE I: Personal Interview . . . STAGE II: Review of applicant's personal and financial background. STAGE III: Review of applicant's proposed site. STAGE IV: Successful completion of Tires Plus Group's Training Program at Tires Plus University." (Ex. 24 at T0341.) The application also states: "Your Franchise Agreement will be issued after the Franchise Review Committee has approved your application through Stage III . . . DO NOT MOVE OR INCUR ANY EXPENSES RELATIVE TO THIS APPLICATION UNTIL YOU HAVE RECEIVED WRITTEN NOTIFICATION OF SUCCESSFUL COMPLETION OF STAGE III OF THIS PROCESS." (Ex. 24 at T0341 (emphasis in original).)

On May 12, 1997, Heartlein completed his personal interview before the Franchise Approval Committee and was granted Stages I and II approval to open a Tires Plus Auto Service Center in Galesburg. (Hyduke Dep. 50-52.) On May 30, 1997, Tires Plus sent Heartlein a franchise agreement, which he signed and returned on June 12, 1997, with his initial payment of $15,000. (Hyduke Dep. at 50-54; Ex. 26; Ex. 24 at T0403; Ex. 15.) Counterclaimants assert that the timing of the franchise agreement was outside the guidelines established by Tires Plus, as Heartlein had not progressed through Stage III.

The franchise agreement contains an integration clause, which provides that it is the only agreement between the parties and supersedes any prior representations or agreements related to the transaction. (Ex. 15 at § 27.11.) The agreement also advises franchisees to retain legal counsel, and Heartlein identified his counsel in the agreement. (Ex. 15 at § 29.7; Heartlein Dep. at 61-63.) Also, Heartlein denoted that no Tires Plus representative had made any representation to him different from those contained in the UFOC. (Ex. 15 at Ex. G.) One other clause of importance to this Motion notes that Tires Plus allows franchisees to purchase supplies or merchandise from any distributor or supplier of the franchisee's choice, so long as the products

comply with Tires Plus's written standards and specifications. (Ex. 15 at § 12.1.)

Tires Plus Vice President for Franchise Development John Hyduke explained at his deposition that although Heartlein had signed the franchise agreement, he remained entitled to cancel his application without cause and obtain a refund of all but $3,500 of his franchise fee until such time as he signed a lease or entered into any purchase agreement to buy land, noting that this escape clause is stated in the UFOC. (Hyduke Dep. at 53-54.) Counterclaimants construe Hyduke's deposition testimony to mean that until a franchisee obtains Stage III approval, he retains the right to cancel. Heartlein, however, was under the impression that he could terminate only by forfeiting the entire franchise fee. (M. Heartlein Dep. at 176-77.) In this respect, the UFOC states in pertinent part:

> You have the right to cancel your Franchise Agreement for any reason before signing documents that legally obligate you to develop the property for the Franchised Service Center. If you exercise this right to cancel, Tires Plus will retain $3,500 for its administrative and out-of-pocket expenses, and will refund the balance of the Initial Fee to you.

(Defs' Ex. marked Ill. UFOC at T0451.) Nonetheless, certain confidentiality and non-competition clauses of the franchise agreement would survive

termination and continue to bind a franchisee. (Hyduke Dep. 53; Hyduke Aff. ¶ 7.)

After signing the franchise agreement, Heartlein underwent one week of classroom training and four months of training in a Tires Plus store. (M. Heartlein Dep. at 27.) During this training, on August 26, 1997, Tires Plus provided Heartlein with a detailed three-year pro forma with costs, sales, and earnings information for the Galesburg Market. (Ex. 7.) The pro forma does not contain any disclaimers or admonitions. (Ex. 7.)

Along with the pro forma, Tires Plus provided Heartlein with a detailed demographic breakdown of the Galesburg market area that included a summary page with the following heading:

CUSTOM SUMMARY REPORT
(MEDIUM MARKET DEMOGRAPHIC ANALYSIS)
BY EQUIFAX NATIONAL DECISION SYSTEMS 800-866-6511.

(Ex. 24 at T0310, T0332.) Tires Plus used a national consumer data firm, National Decision Systems, a wholly-owned subsidiary of Equifax National Decision Systems ("Equifax"), to provide the company with relevant census information. (Hyduke Aff. ¶ 9.) Equifax is considered an objective, third party source of demographic information. However, Tires Plus also included, near the bottom of the page, a "multiplier factor" that increased projected sales

volume by twenty-five percent for the Galesburg franchise above that presented by Equifax. (Ex. 24 at T0310, T0332.) Thus, the final numbers at the bottom of the report are not the "Equifax Store Potential" (located above), but rather a "Total Store Potential" figured by Tires Plus as twenty-five percent higher earnings. (Ex. 24 at T0310, T0332.) This "multiplier factor" is not labeled as being supplied by Tires Plus and is in the same typeface as the rest of the document. (Ex. 24 at T0310, T0332.) The multiplier was inserted by Tires Plus into the Equifax documents for both franchises in this case to bring projected sales results for potential new stores into line with the actual results of existing Tires Plus stores. (Hyduke Dep. at 71-77; Hyduke Aff. ¶ 9.)

Heartlein signed a lease for the Galesburg franchise location on August 26, 1997, the same day he received the Galesburg pro forma. (Ex. 7; M. Heartlein Dep. at 107.) When questioned about the timing of these events during his deposition, Heartlein indicated that he had "no idea" whether receiving the pro formas had anything to do with signing the lease the same day. (M. Heartlein Dep. at 106.) On September 12, 1997, Tires Plus informed Heartlein that the Galesburg franchise was approved through Stage III. (Ex. 24 at T0304; Ex. 28.) On September 16, Heartlein paid Tires Plus the remaining $12,000 owed on the franchise fee. (Ex. 24 at T0364.)

Counterclaimants assert that Heartlein was locked into the agreement only at this point. The Galesburg franchise began operating in October 1997, and by early 1998, it was operating at a loss.

Meanwhile, Heartlein and Tires Plus proceeded with the sale of another franchise located in nearby Burlington, Iowa. Heartlein asserts that he was assured by Tires Plus management that the opening of another store would help improve visibility and cash-flow at the Galesburg store. (M. Heartlein Dep. at 190-91.) Tires Plus provided a UFOC for the Burlington stores on March 5, 1998. (Ex. 30 at T0416.) On April 13, 1998, Heartlein and Karmark applied for the Burlington franchise. (Hyduke Dep. at 93.) Stage II approval followed on May 7. (Ex. 30 at T0373.) On June 4, Heartlein and Karmark signed a franchise agreement, once again prior to Stage III approval and prior to finding a franchise site. (Hyduke Dep. at 94-96; Ex. 32). In July, Karmark paid the initial fee of $8750. (Hyduke Dep. at 99; Ex. 33.) At the same time, Heartlein also purchased from Tires Plus an option on a third franchise location in Decatur, Illinois, which he never exercised. (Hyduke Dep. at 99-100.) Tires Plus executed the Burlington franchise agreement on August 11, 1998. (Hyduke Dep. at 98; Ex. 33.) The Burlington and Galesburg franchise agreements contain identical integration clauses and disclaimers on

reliance on representations made outside the UFOCs. (Exs. 15 and 32 at § 27.11; Exs. 15 and 32 at Ex. G.) In December 1998, Tires Plus proposed certain modifications to the payment of accounts receivable from Heartlein to help him through the period of "difficult cash flow" at his poorly performing Galesburg franchise. (Ex. 34.)

Heartlein signed the lease for the Burlington franchise site on January 15, 1998. (Ex. 45 at 26.) On January 25 and again on April 27, 1999, Tires Plus provided pro formas for the Burlington franchise that were identical in form and format to the Galesburg pro forma, including Equifax reports with Tires Plus multiplier factors. (Exs. 8, 9; Hyduke Dep. at 106-09.) The multiplier factor in this Equifax report increased projected sales volume by forty-seven percent for the Burlington franchise above that presented by Equifax. (Ex. 49.) On May 17, 1999, the Burlington franchise obtained Stage III approval from Tires Plus. (Hyduke Dep. at 101-02; Ex. 30.) Karmark made the final franchise fee payment on the Burlington franchise on May 24, 1999. (Ex. 30 at T0413.)

Throughout 1999 and 2000, both franchises operated at a significant loss and Heartlein was delinquent on the payment of both franchise and advertising fees, and on his account for the purchase of tires

and goods from Tires Plus. (Countercls' Mem. Supp. Mot. Amend at 13-14.) Finally, in December 2000, Tires Plus notified Heartlein of its intent to terminate his franchises, which it formally did in April 2001. (Exs. 36, 40.)

## IV. DISCUSSION

Tires Plus argues that it is entitled to summary judgment as to the remaining counterclaims of fraud, negligent misrepresentation, breach of contract (to the extent the claim relies on pre-franchise agreement representations), and violation of the Illinois Franchise Act.

### A. Minnesota Common Law Fraud

Counterclaimants allege three specific types of fraud. First, Counterclaimants assert that prior to Heartlein's execution of the franchise agreements, Tires Plus fraudulently represented the following: (1) the Tires Plus name and logo were nationally recognized and carried significant market value in the relevant franchise markets; (b) Tires Plus franchisees enjoyed an advanced, sophisticated, and profitable tire store operating system; (c) Tires Plus franchisees enjoyed significant group volume buying power, enabling franchisees to purchase inventory at a discount; (d) Tires Plus's computer system was state-of-the-art; (e) Tires Plus would provide innovative marketing and advertising programs; (f) Tires Plus was an industry leader in education and store operations systems; and (g) Tires Plus would provide significant field

operations assistance. (Second Am. Countcl. ¶¶ 6, 15, 41.) The second type of fraud asserted by Counterclaimants regards representations contained in the pro forma reports provided by Tires Plus. (Second Am. Countcl. ¶¶ 7, 14.) Third, Counterclaimants allege that Tires Plus committed fraud by failing to disclose certain rebates it received from vendors based on sales of products to Tires Plus franchisees. (Second Am. Countcl. ¶¶ 8, 16.)

### 1. Pre-Franchise Negotiations

Both of the franchise agreements executed by Heartlein include an integration clause that specifically disclaims any representations not contained in the terms of the agreement itself. The pertinent clause appears in each agreement as follows:

> **27.11 Entire Agreement.** This Agreement supersedes and terminates all prior agreements, either oral or in writing, between the parties which pertain to the Marks, the Standardized System of Operations and the Franchisee's Tires Plus® auto service center and therefore, any representations, inducements, promises or agreements between the parties not contained in this Agreement or not in writing signed by the Company and the Franchisee will not be enforceable. This Agreement constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between the Company and the Franchisee relating to the subject matter of this Agreement.

(Exs. 15 and 32 at § 27.11.) Accordingly, Plaintiffs argues that the only duties the parties owed to each other were those duties enumerated in the final franchise agreement.

In Minnesota, proof of promissory fraud cannot be made by representations that contradict the terms of the integrated contract. Crosby v. Crescent Oil Co., 255 N.W. 853, 857 (Minn. 1934.) However, "[w]hen a promise is not in plain contradiction of a contract, the question of legal reliance is for the trier of fact." Veit v. Anderson, 428 N.W.2d 429, 433 (Minn. Ct. App. 1988). Further, even if a promise is plainly "contradictory, when it is accompanied by misrepresentations of other material facts in addition to the contradictory intent, the question of reasonable reliance is for the trier of fact." Johnson Bldg Co. v. River Bluff Dev. Co., 374 N.W.2d 187, 193 (Minn. Ct. App. 1985). Importantly, an integration clause does not prevent proof of fraudulent representations by a party to a contract. Hanks v. Hubbard Broad., Inc., 493 N.W.2d 302, 310 (Minn. Ct. App. 1993) (citing Johnson Bldg. Co., 374 N.W.2d at 193).

Plaintiff argues that Counterclaimants' fraud claims based on pre-agreement representations are directly contradicted by the terms of the franchise agreement, and thus, are both ripe for summary judgment and

destroyed by the contract's integration clause. Heartlein and Karmark insist that under Minnesota law, they should be able to present their proof of Tires Plus's fraudulent representations. The Court finds that there is enough ambiguity between the alleged representations and the contract to leave the pre-franchise agreement issues for the jury to decide. Tires Plus's Motion for Summary Judgment is denied with respect to the claims of fraud stemming from pre-franchise negotiations.

**2. Representations in the Pro Formas**

Counterclaimants assert that Tires Plus knowingly used false sales projections in the pro formas to entice them to purchase the franchises, such that they have established a prima facie case of common law fraud that should proceed to the jury. Minnesota courts have defined the elements of fraud as: (1) "a false representation pertaining to a material past or present fact susceptible of human knowledge;" (2) knowledge by the one making the representation of its falsity, or assertion of it without knowledge of its truth or falsity; (3) "an intention that the other person act on it, or circumstances justifying the other person in so acting;" (4) the other person in fact reasonably relied on the representation; and (5) damage attributable to the misrepresentation. In re Strid, 487 N.W.2d 891, 893-94 (Minn. 1992) (citation

omitted); In re Anderson, 565 N.W.2d 461, 465 (Minn. Ct. App. 1997). Fraud must be proven by a preponderance of the evidence. State by Humphrey v. Alpine Air Prods., Inc., 500 N.W.2d 788, 791 (Minn. 1993).

The issue of fraud must be viewed against the backdrop of the parties' relationship. E.g., Hollerman v. F.H. Peavy & Co., 130 N.W.2d 534, 540 (Minn. 1964). Further, a party who is inexperienced in matters concerning the representations made may have a right to rely upon the superior knowledge of another, particularly in the context of a knowing and intentional fraud. Fischer v. Division of W. Chincilla Ranch, 310 F. Supp 424, 429 (D. Minn. 1970) (applying Minnesota law).

Specifically at issue in the present case are the documents provided by Tires Plus for each franchise that included Equifax Custom Summary Reports, described in section III, supra. Heartlein asserts that he believed each report originated wholly from Equifax, not in any part from Tires Plus, and that he was lead to believe such by the format of the reports. Plaintiff insists that Counterclaimants cannot show that they relied upon the pro formas.

The Court finds that Counterclaimants have established the first element of fraud through the Equifax reports altered by Tires Plus without

notification to the franchisee. Tires Plus presented the franchisees with documents that appear to be from a third-party, objective source, when in fact they contain key numbers supplied by the franchisor. Nothing in the reports indicate that any information is derived from any source other than Equifax. These documents create a prima facie showing of false representations pertaining to material present facts susceptible of human knowledge. See In re Strid, 487 N.W.2d at 893-94. The parties note that allegations of fraud must relate to a past or existing fact rather than future contingencies or predictions. See Schoenhals v. Mains, 504 N.W.2d 233, 236 (Minn. Ct. App. 1993.) While the pro formas present potential sales figures, the representation that the figures originated from an objective third party constitutes an existing, actionable fact. Likewise, the evidence establishes the second element of fraud as Tires Plus knew that the documents were not generated wholly from Equifax, and thus, knew the representations were false. See In re Strid, 487 N.W.2d at 893-94. Third, viewing the evidence in the light most favorable to Counterclaimants, the Court finds that the circumstances justified Counterclaimants in believing the falsity. See id.; see also Lower Brule Sioux Tribe, 104 F.3d at 1021 (standard of review).

Fourth, again construing the evidence in Counterclaimants' favor, the Court cannot find as a matter of law that Heartlein and Karmark had lost the right to rescind without cause until Stage III approval of their site leases. Although Mr. Hyduke's deposition testimony was that a franchisee retained the right to cancel until he signed a lease, the UFOC provides for the right to cancel "before signing documents that legally obligate [franchisee] to develop the property for the Franchised Service Center." (Defs.' Ex. marked Ill. UFOC at T0451. (emphasis added).) According to the undisputed time line, Counterclaimants received the Equifax reports with the Tires Plus multiplier factors before Stage III approval of either franchise. Further, Heartlein testified in his deposition that he took the pro formas to be "an accurate representation of what our sales would be for the first three years . . . based on a professional, outside source, Equifax, coming in and doing all these demographics and that they had researched the community . . . ." (M. Heartlein Dep. at 98.) Thus, the Court may determine for purposes of summary judgment that Counterclaimants reasonably relied on the altered Equifax reports in choosing to forego their right to cancel until Tires Plus had formally approved of the lease space. See In re Strid, 487 N.W.2d at 893-94. Finally, the fifth element of fraud is met in that Heartlein and Karmark have

shown damage attributable to the misrepresentations. See id.; (Ex. 12: Expert Damages Report.) Hence, Tires Plus's Motion for Summary Judgment is denied in this respect.

### 3. Claims Involving Third Party Vendor Rebates

Counterclaimants allege that unbeknownst to them, Tires Plus had agreements with certain third party vendors, whereby these companies charged franchise stores an inflated price for goods purchased directly from them, and that the vendors would rebate between five and ten percent of the franchisee's purchases to Tires Plus. Counterclaimants assert that Tires Plus had a duty to disclose this arrangement in its UFOC. However and importantly, Heartlein admits that under the UFOC, he was free to purchase goods from any third party vender of his choice. (Second Am. Countercl. ¶ 16.) Heartlein and Karmark assert this scheme constitutes fraud by omission.

In this regard, the Court found in its Order of March 17 that Counterclaimants failed to provide facts sufficient to show fraud by omission. The Court reiterates that finding now, as Heartlein and Karmark present no evidence of false representation by Tires Plus in its UFOC. (See Defs' Ex. marked Ill. UFOC at 6-9, 13-15.) Also, Counterclaimants have offered no evidence of detrimental reliance or damage in that there is no indication of

whether the vendor payments resulted in any price differential to franchisees. See In re Strid, 487 N.W.2d at 893-94. Hence, Plaintiff's Motion for Summary Judgment is granted with respect to Counterclaimants' claim of fraud by omission with respect to vendor rebates.

### B. Minnesota Common Law Negligent Misrepresentation

Counterclaimants' negligent misrepresentation claim are based on the same representations as those on which Counterclaimants rely for their common law fraud claim. To succeed on a claim for negligent misrepresentation under Minnesota law, Counterclaimants must present evidence demonstrating that: (1) Tires Plus made a false representation of a material past or present fact; (2) Tires Plus either had knowledge of such falsity or asserted knowledge of the representation without knowing whether it was true or false; (3) Tires Plus intended Counterclaimants to rely on the representation; (4) Counterclaimants reasonably relied on that representation; and (5) Counterclaimants suffered damages as a proximate result of their reliance. See Florenzano v. Olson, 387 N.W.2d 168, 174 (Minn. 1986) (citations omitted). The only difference in Minnesota between a claim for fraud and one for negligent misrepresentation is that a fraud claim requires knowledge of a statement's falsity, whereas negligent misrepresentation does

not necessarily require such knowledge. Id. at 173; cf. In re Strid, 487 N.W.2d at 893-94. Hence, for the reasons expressed by the Court in section IV.A.2, supra, Tires Plus's Motion for Summary Judgment is denied as to Counterclaimants' claim for negligent misrepresentation.

### C. Breach of Contract Claims Relying on Pre-Franchise Agreement Disclosures

Plaintiff moves for summary judgment to the extent that Counterclaimants rely on pre-franchise agreement representations to support their claim for breach of contract. For the same reasons enunciated in section IV.A.1., supra, the Court denies Tires Plus's Motion for Summary Judgment on this issue.

### D. Illinois Franchise Act Claims

Counterclaimants raise claims under §§ 705/6 of the Franchise Act, which prohibits fraudulent practices "in connection with the offer or sale" of a franchise. 815 Ill. Comp. Stat. 705/6. Specifically, Counterclaimants assert that Plaintiff made false representations in the pro formas and failed to disclose rebates received from certain vendors. (Second Am. Countercl. ¶¶ 62, 69.)

1. **Franchise Act Claims Regarding Vendor Rebates**

Counterclaimants also assert that the rebate system described in section IV.A.3., supra, violates the Franchise Act. Heartlein and Karmark argue that the scheme violates regulations that require a franchisor to disclose recurring fees or payments that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in whole or in part on behalf of a third party. 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 6.

In this regard, the Court found in its Order of March 17 that Counterclaimants failed to make out a prima facie case because they presented no evidence of fees that Counterclaimants had to pay to Tires Plus or an affiliate, or of fees that Tires Plus or an affiliate collected on behalf of a third party. See id. Regardless of the amount of rebates some venders were returning to Tires Plus, Counterclaimants have not presented facts sufficient to show a violation of this Franchise Act regulation.

Counterclaimants also assert that the rebate system violates Item 8 of the UFOC guidelines, which sets out certain disclosure requirements if a franchisor will receive revenue "as a result of required purchases or leases." 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 8(D) (emphasis added).

As the record is clear that Counterclaimants were free to purchase goods from any vendor they chose, the Court finds that, similar to the claim under item 6, Heartlein and Karmark have not presented sufficient facts to survive summary judgment as to their claim under item 8. Hence, the Court grants Plaintiff's Motion for Summary Judgment as to all Franchise Act allegations regarding the vendor rebate system.

### 2. **Franchise Act Claims Regarding Pro Formas**

Counterclaimants also assert that Tires Plus violated the Franchise Act through its pro formas. The Act defines "fraudulent practices" as follows:

> Fraudulent Practices. In connection with the offer or sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

815 Ill. Comp. Stat. 705/6. The Act also mandates that all UFOCs be free from any false or misleading statement of material fact. 815 Ill. Comp. Stat. 705/16. The Franchise Act further provides regulations governing the use of earnings statements for prospective franchisees. In pertinent part, the

regulations require that an earnings claim made in connection with an offer of a franchise shall be included in full in the UFOC, have a reasonable basis at the time it is made, and shall include a description of its factual basis and the material assumptions underlying its preparation and presentation. 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 19. The regulations also require earnings claims to carry "[a] conspicuous admonition that the new franchisee's individual financial results are likely to differ from the result stated in the earnings claim." Id. at item 19(B)(ii)(c). Counter-claimants also point out that the regulations hold that the "burden is upon the franchisor to show that it has a reasonable basis for its earnings claim." Id. at item 19A(v).

The Court finds that Counterclaimants have made out a prima facie case for fraudulent practices under the Franchise Act. The evidence taken in the light most favorable to Counterclaimants shows that Tires Plus employed a scheme to defraud by omitting statements of material fact, necessary to make the statements not misleading under the circumstances, by omitting information from the pro formas that would have revealed that the report labeled as originating from Equifax also contained numbers inserted by Tires Plus. See 815 Ill. Comp. Stat. 705/6. The evidence, when construed in

favor of Counterclaimants, also shows that this practice or course of business by Tires Plus operated as a fraud or deceit. See id.

Additionally, the Court finds that the pro formas would qualify as earnings statements under the regulations, such that they should have included a description of the factual basis and material assumptions underlying the reports' preparation and presentation. See 4 Ill. Admin. Code §§ 200.118 and 200 App. A, Ill. L, item 19(A)(i), (B)(i)-(ii). Similarly, the pro formas failed to carry "[a] conspicuous admonition that the new franchisee's individual financial results are likely to differ from the result stated in the earnings claim." See id. at item 19(B)(ii)(c).

Tires Plus argues also that these claims are barred because the general anti-fraud provision and the earnings claim regulations of the Franchise Act are limited to statements made in the offer or sale of a franchise, and that Counterclaimants' allegations stem from the time after Counterclaimants had signed the franchise agreements. For the same reasons enunciated in section IV.A.2., supra, the Court cannot find as a matter of law that the franchisees here were bound to the franchise agreements prior to Stage III approval. Until that moment, they could not hang the proverbial sign above their door, and could not operate as Tires Plus

franchises. Hence, the Court is satisfied that a jury question exists as to whether Counterclaimants were prospective franchisees at the crucial times. Consequently, the Court finds that Counterclaimants have presented prima facie Franchise Act claims regarding the pro formas that should survive summary judgment.

### 3. Statute of Limitations Defense

However, Plaintiffs also now assert that the Franchise Act claims should be dismissed on statute of limitations grounds. The Act contains a three year statute of repose unless a shorter period applies because of the franchisee's awareness of the violation or the franchisor's providing the franchisee notice of the violation. 815 Ill. Comp. Stat. § 705/27.

In response, Counterclaimants assert that the claims are not time-barred because of Illinois's set-off statute, 735 Ill. Comp. Stat. § 5/13-207, or fraudulent concealment statute, 735 Ill. Comp. Stat. § 5/13-215. However, Plaintiffs are correct to point out that the only category of Illinois law that controls this case is, by stipulation, the Franchise Act, along with the regulations promulgated thereunder and decisional law regarding the Act. (Stip. & Order. of March 9, 2004 ¶3.) Minnesota law controls all else. (Stip. & Order. of March 9, 2004 ¶ 4.) Hence, the statute cited by Counterclaimants

cannot save their claims. The counterclaim was filed on October 26, 2001. Accordingly, under the statute of limitations, any claims that commenced prior to October 26, 1998 are time-barred. See 815 Ill. Comp. Stat. § 705/27.

Heartlein was provided the Galesburg pro forma on August 26, 1997. (Ex. 7; Ex. 24 at T0312-28.) The Court concludes that the Franchise Act claims based on statements contained in the Galesburg pro forma are indeed time-barred, as they arose more than four years before Heartlein filed his counterclaims. Thus, summary judgment in favor of Tires Plus is granted in this respect.[3]

Heartlein and Karmark were first provided a Burlington pro forma on January 25, 1999, less than three years before bringing their counterclaims. (Ex 8.) Hence, their assertions as to statements in the

---

[3] Importantly, under Minnesota law, while a counterclaim asserted outside the relevant statute of limitations is properly dismissed, a counterclaimant is yet entitled to maintain a recoupment action where the Court has found that it has produced sufficient evidence to survive summary judgment. See Household Fin. Corp. v. Pugh, 288 N.W.2d 701, 703-04 (Minn. 1980) (citations omitted); see also J & D Constr. Inc., v. Ramy Int'l Ltd., 2001 WL 969146 (Minn. Ct. App. Aug. 28, 2001) (unpublished decision discussing propriety of maintaining recoupment claim to reduce or avoid plaintiff's recovery where counterclaim is barred by statute of limitations). Accordingly, Counterclaimants may retain recoupment claims to their Franchise Act allegations based on statements contained in the Galesburg pro formas.

Burlington pro formas are timely and will proceed before the jury. Summary judgment is denied in this respect.

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

(1) Plaintiff's Motion for Summary Judgment as to Defendants' Counterclaims (Doc. No. 65) is **GRANTED IN PART** and **DENIED IN PART** as explained fully in the body of this Order.

Dated: April 19, 2004

/s/ Jonathan Lebedoff
JONATHAN LEBEDOFF
Chief United States Magistrate Judge